■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DARRELL JOE, Appellant. [47 NYS3d 244]—

---

Judgment, Supreme Court, Bronx County (Barbara F. Newman, J.), rendered October 4, 2011, convicting defendant, after a jury trial, of attempted murder in the second degree, and sentencing him, as a second violent felony offender, to a term of 16 years, unanimously affirmed.

The charge of attempted murder arose out of allegations that defendant shot Ralph Barry. In the hospital after the shooting, Barry described his assailant to Detective Daniel Brady as "a light-skinned male with braids and a black coat." An eyewitness to the shooting met with Brady several days after the shooting and that meeting, Brady testified, led to the issuance of a "wanted card" for defendant which, he further testified, is generally issued "when a person gets identified." Defendant was charged with attempted murder when he was arrested for trespass five months after the shooting. A police officer had become suspicious of defendant after observing him engaged in what appeared to be a hand-to-hand drug transaction and approaching him, at which point defendant fled to the roof of a "Clean Halls" building. He then resisted arrest, gave a false name and refused to be fingerprinted or provide an address.

Prior to the trial for the attempted murder charge (the trespass charge having been dropped by the People), defendant moved to exclude, as prejudicial, any evidence regarding the circumstances of the trespass. The court denied the motion, finding that the trespass details were relevant to the People's theory that defendant's flight exhibited his consciousness of guilt for the attempted murder.

Before jury selection, defendant, despite defense counsel's indication that defendant would waive the right to be present at sidebars during jury selection, asserted his right to be present. After each of two bench conferences that were held with prospective jurors, defense counsel confirmed on the record that the court had asked him to confer with his client as to whether the latter wanted to attend and defendant stated that it was acceptable for the conference to be conducted without his presence. Two days later, a prospective juror informed the court that her fiancée had pleaded guilty to murder, in a gang-related incident. The record does not indicate that the court directed defense counsel to inquire into whether defendant wanted to be present at an ensuing sidebar. Rather, the transcript's only reference to attendance at the sidebar is as follows: "Whereupon, the following discussion takes place on

the record, at the sidebar, in the presence of the Court and counsel." During the sidebar, the juror indicated that she was not sure that she could be impartial. The juror was dismissed. The transcript then states: "Whereupon, the following takes place on the record in open Court in the presence of all parties."

Barry did not testify at trial. During Detective Brady's testimony, over defendant's objection as to relevance, the People showed him a photograph of Barry, which was then shown to the jury. The People had argued that the picture was relevant to clarify what Barry meant when, as related to the jury by the detective, he told the detective that the person who shot him was "white complected" or "light-skinned." They explained that this description was meant to be in comparison to his own complexion and so the picture was necessary to portray the contrast. The court agreed with defendant's position that no inference could be drawn that the victim had been making a comparative description, but allowed the picture to be shown to demonstrate that the victim was "a real person."

During its deliberations, the jury twice submitted a note to the court stating that it was deadlocked. After the second note, the court issued an *Allen* charge, reviewed prior to delivery by defense counsel without objection, which included the following statement: "Remember what you promised when you were being selected. You each solemnly promised that you will honestly deliberate. You promised on your oath that you would decide the case only on the evidence in the courtroom and the laws as I told them to you. And you would do so without prejudice, without sympathy, without considering punishment. You each solemnly promised that you would tell the others your views based on the evidence and the law, and you would try to convince the others that you were correct."

Defendant argues that the proceedings were tainted from the very outset by his exclusion from the two sidebars during jury selection. "[A] sidebar discussion with a prospective juror regarding her background, bias and ability to be impartial is considered a material stage of a trial," and "[e]xclusion of a defendant from such a sidebar discussion without first obtaining a knowing, intelligent and voluntary waiver of the right to be present constitutes per se reversible error where the prospective juror is either seated on the jury, excused on consent, or peremptorily challenged by the defense" (*People v Williams*, 52 AD3d 94, 96 [1st Dept 2008]). Here, given the prospective juror's inability to state unequivocally that she could remain impartial despite her fiancee's having been convicted of murder,

her dismissal for cause was ultimately required (*see People v Chambers*, 97 NY2d 417, 419 [2002]; *People v Childs*, 247 AD2d 319, 322 [1st Dept 1998], *lv denied* 92 NY2d 849 [1998]). Thus, *Williams* did not require defendant's presence for the sidebar. Having reached this conclusion, we need not address defendant's contention that the court violated his right to be present, a right that he had affirmatively invoked at the beginning of the proceedings.

Defendant next argues that the court should not have permitted the facts surrounding his trespass arrest to be presented to the jury, since, he states, there was no evidence that he was aware he was being sought for a shooting when he fled the police, or that he fled because of such an awareness. Consciousness-of-guilt evidence may be admitted to establish criminal liability so long as its relevance is not outweighed by its tendency to prejudice the defendant (*see People v Bennett*, 79 NY2d 464, 470 n 2 [1992]). We agree with the People that defendant's response to his being arrested for trespassing, including struggling with a police officer, giving a false name, and refusing to submit to fingerprinting or to furnish an address, was disproportionate, and at least suggested a concern that he was soon going to be held to account for the shooting of Barry. *People v Moses* (63 NY2d 299 [1984]), cited by defendant, is distinguishable because it turned specifically on the adequacy of certain consciousness-of-guilt evidence to satisfy the statutory accomplice corroboration requirement. Notably, the Court did not hold that evidence of the defendant's false alibi was inadmissible. *People v Gadsden* (139 AD2d 925 [4th Dept 1988]), also relied on by the defense, does not stand for the proposition that flight can never be probative of guilt, and we find that under the circumstances presented here the court properly admitted the evidence. Defendant's arguments that the court should have at the very least issued a limiting instruction with respect to the consciousness-of-guilt evidence and that the trespass and attempted robbery charges should never have been joined in the first place are unpreserved, and we decline to reach them in the interest of justice.

We agree with defendant that the admission of the photograph of Barry served no practical purpose, and that the court properly declined to admit it for the proffered purpose of permitting a comparison between Barry's skin color and defendant's. However, to the extent that the court admitted it to satisfy any desire the jury may have had to visualize the nontestifying victim, it was harmless error. It is widely recognized that in a *homicide* case, it is prejudicial to place a

picture of the deceased before the jury in a case with less than overwhelming evidence of guilt, since doing so can "inflame the jury's emotions and . . . introduce into the trial an impermissible sympathy factor" (*People v Donohue*, 229 AD2d 396, 398 [2d Dept 1996], *lv denied* 88 NY2d 1020 [1996]). Indeed, each of the cases cited by defendant is a homicide case. Here, Barry was alive when the case was tried. Had he come to court to testify, certainly the defense could not have been heard to argue that his presence in the courtroom would have had a prejudicial impact on the jury. Further, even though Barry was seriously wounded, the picture shown to the jury was not one showing him performing an activity he might no longer be able to engage in since he was shot. Rather, it was an innocuous headshot. Accordingly, it could not have elicited feelings of sympathy so strong as to dispose the jury to convicting defendant.

Defendant further claims that the People should not have been allowed to elicit hearsay testimony from Detective Brady concerning Barry's description of defendant, since Barry did not later make a corporeal identification (*see People v Huertas*, 75 NY2d 487 [1990]). This argument is unpreserved, and we decline to reach it in the interest of justice. Discussion of admissibility of the photograph and of the *Huertas* issue occurred simultaneously before the court, and, while defense counsel clearly objected to the photograph and took an exception to the court's ruling, at no time did he expressly protest admission of the testimony concerning Barry's description. Defendant's argument that he should have been permitted to impeach the description testimony by questioning Brady about Barry's inconsistent grand jury testimony is unavailing. Barry would have had to testify directly, and defendant did not establish that he was unavailable.

Defendant also contends that the court, instead of simply striking Brady's testimony that, upon interviewing the eyewitness after the shooting, he issued a "wanted card" and that wanted cards are issued "when a person gets identified," should have declared a mistrial. We find that the overall impact of the suggestion that the eyewitness identified defendant was insufficient to warrant a mistrial. To the extent defendant complains that the prosecutor referenced the testimony during his summation, it is noted that this echoed defense counsel's own reference to the wanted card during his summation.

We reject defendant's position that the *Allen* charge, to the extent it reminded the jurors that they "each solemnly promised that you would tell the others your views based on

the evidence and the law, and you would try to convince the others that you were correct" was coercive and impermissibly shifted the burden of proof to him from the People. Read as a whole, the instruction was balanced and it did not exert untoward pressure on the jury, since it adequately conveyed the principle that a juror should not abandon his or her conscientiously held beliefs in reaching a verdict. This case contrasts with *People v Aponte* (2 NY3d 304 [2004]), relied on by defendant, in which the Court of Appeals recognized a host of elements that rendered the charge unbalanced and coercive, and observed that "the charge here did not include any encouraging language to balance its instruction that the jury needed to 'decide this case' " (2 NY3d at 309).

Defendant's argument that the charge impermissibly shifted the burden of proof is similarly unavailing (*see People v Antommarchi*, 80 NY2d 247 [1992]). In *Antommarchi*, the court's *Allen* charge contained the following language: "You swore that, if you have a reasonable doubt, I repeat, a reasonable doubt, on any relative point or material element or on the evidence or lack of it, and when one or more of your fellow jurors questioned you about it, you would be willing and able to give him what you believe is a fair, calm explanation for your position based upon the evidence or the lack of evidence in this particular case" (*id.* at 251). The Court concluded that this language impermissibly shifted the People's burden, finding that it "plac[ed] on each juror the express duty of giving a 'fair, calm explanation for your position,' " and "require[d] jurors to supply concrete reasons 'based upon the evidence' " (*id.* at 252). Other cases have reversed convictions based on similar language (*see People v Arce*, 215 AD2d 277, 278 [1st Dept 1995] ["If you had a reasonable doubt on any relative point . . . and one or more of your fellow jurors questioned you about it, he (sic) would be willing and able to give what you believe is a fair, calm explanation of your position based upon the evidence or lack of evidence"]; *People v Henry*, 283 AD2d 587, 588 [2d Dept 2001] ["try to convince the others, if you could, that you're correct and show them why you're correct. Show them the law. Show them the evidence"]).

The sentence complained of here, although it did use the word "convince," is distinguishable from the language found improper in *Antommarchi* and similar cases. Considered in context, it does not rise to the level of "impos[ing] an affirmative obligation on the juror to specifically articulate the basis for such doubt" (*Antommarchi*, 80 NY2d at 251).

Finally, we find that certain statements made by the prosecu-

tor during his summation did not rise to the level of misconduct, and we perceive no basis for reducing the sentence. Concur—Acosta, J.P., Richter, Mazzarelli, Kapnick and Gesmer, JJ.